The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez, Oyez, Oyez. All persons having any manner or form of business before the Honorable of the United States Court of Appeals for the Fourth Circuit are admonished to draw a nine and give their attention for the Court is now sitting. God save the United States and this Honorable Court. Good morning. Please be seated. We're happy to hear argument in our first case, number 164522, United States v. Fallon. Palin, sorry. I can't read my own hand. I wanted to make sure I was on the right case. You can always go with the case number. I can't usually get that. I'm not good at numbers, Your Honor. Between the two of us, you're never going to get hurt. I get the name wrong and you get the number wrong. Good morning, Your Honors. My name is Mike Corey. I'm counsel for Beth Palin on this appeal. I was also her lawyer in the trial court. This case should be reversed. It should be reversed because under United States v. Gowden, the trier of fact did not consider materiality at the trial. Materiality is an essential element of the crimes of health care fraud and conspiracy to commit health care fraud, which were the crimes that the trial court convicted both Beth Palin and Joe Webb of. The trial court then compounded its error by not ordering a new trial, but pushing the rewind button on the trial and considering materiality at a motion for new trial. We should start from the beginning. Where is an element of health care fraud? You've got two elements there. How is that an essential element of it? Well, I think every element of any crime is an essential element. Does the word materiality appear within the elements? It does not appear in the statute, but virtually every circuit that has considered this issue has held that materiality is an element of the crimes of health care fraud. It arises from scheme to the fraud. It's a sub-element of that. I believe it's an essential element of the crime. Fraud involves... Scheme to the fraud is an essential element, and proving that materiality is a sub-element of that. So if the judge says scheme to the fraud, why doesn't it include materiality? Well, the scheme to the fraud, I don't believe can be a crime unless it's material to the actual fraud itself. So if he says scheme to the fraud, why has he not already said it? Oh, I understand. Well, because in his order denying the motion for new trial, he indicated that he did not consider materiality at all. No, he said he didn't see it as an essential element. He didn't say I didn't consider it. He said he didn't consider it an element, because it's not. The scheme to the fraud is an essential element. And the scheme must be material in order to constitute a crime. Exactly. So when he gives the instruction of scheme to the fraud, it includes materiality. I disagree, Your Honor. But isn't, I think to go to Judge Wynn's question, isn't materiality a component? And I'm sorry, I think this goes to the question. Isn't materiality a necessary part of the common law crime of fraud? It is. And I think every circuit that has considered this question, as a matter of fact, the United States Supreme Court in universal health services in the False Claims Act context has went back to the common law and spent a great deal of time on how materiality is part of every fraud case. Not every fraud case. It says that they cabinet just to False Claims Act cases. Your Honor, I believe in that decision. I'm not saying every fraud case, but the holding of health services is just to False Claims Act cases. Of course. Only that. They had a reason for doing it. They didn't want to apply to this. And again, Your Honor, I don't want to be in this position, but I disagree. If you look at pages 15 and 16 of the universal health services case, the court borrows from many different types of fraud cases. I believe it's tax cases, different types of immigration cases, different types of criminal cases. And the False Claims Act case, of course, is a first cousin of the case that we're dealing with here. They're all fraud cases. And the United States Supreme Court went back and looked at the common law. As a matter of fact, one of my favorite quotes in that case is from something I haven't looked at since law school called Williston. And so all those different types of fraud were applied to the False Claims Act area. And I believe that in order for any fraud case to be actionable on the civil side or to be a crime on the criminal side, there must be materiality. Could I ask, you're rapidly running out of time, and I think I would agree with, or certainly the materiality. But doesn't it necessarily consider materiality in its assessment of fraud under its common law fraud analysis? No, as a matter of fact, because the court says that it did not consider materiality in rendering its verdict. That's why it went to the trouble to say that it didn't make any difference in the outcome had he considered materiality. And to read in the materiality requirement... How do you assess a common law fraud analysis without necessarily assessing materiality as a component of it? That's exactly what the judge did. He came to the conclusion that criminal fraud existed without considering materiality, and he says so in his opinion, denying the motion for new trial. And that's why the trial court went on and indicated... I'm sorry, I thought that the whole gist of your argument was that we couldn't consider in determining whether the district court had or had not found materiality with respect to the misrepresentation of the fraud here, because we could not look at what happened post-trial. And now you're saying you're relying on what he said post-trial yourself. Right. You know, you can't have it both ways. Well, I think I can, and let me explain. Don't look post-trial. We're just looking at what he said at the trial. Right. And the reason why I look post-trial is to show that he concedes that he did not consider materiality at the trial. No, I understand why you're looking for it, but the gist of your argument is that we can't consider this in considering what he did in the trial. And if we can't, then we're just stuck with what he said in the trial, and I'm not sure you're right about that. But if you are right, you can't look at it for the purposes that you want to look at it for. So then we look at what he said during the trial about this. And he talked about the health care benefit programs have rules prohibiting providers from submitting claims for medically unnecessary services. He said a bunch of things that perhaps indicate that he did, in fact, incorporate a materiality. He talked about medical necessity in that regard, Your Honor, and I submit to you that he confused the issues of materiality. There was no question at this trial that urine drug screens for individuals with addiction issues are medically necessary. The question was whether the quantity of urine drug screens were medically necessary. And whether they had not been given to certain patients for certain reasons and given to other patients for other reasons. And the reason was they couldn't pay, and that's business, not fraud. Actually, it turned on the availability of insurance money to pay. And I thought that the judge did consider as a single element the requirement that a defendant knowingly devise a scheme or artifice to defraud a health care benefit plan in connection with the at trial without the benefit of, without interpreting what he said later, whether if you're talking about a knowing scheme to defraud that induces payment, why that doesn't necessarily have to be material. Because it has to have an outcome determinative effect.  Well, you haven't let me finish. If it has to have that outcome, why does it not have to be material? For a couple reasons. Number one, no federal law requires laboratories to vet the medical necessity. That's not an answer, though. Just stay with me on what the judge considered. And tell me how you can induce a payment on the basis of a scheme or artifice to defraud and have that scheme or artifice not to be material if its consequence, the purpose and its consequence, is to result in payment. Just stay with me on that. All right. Because of Karen Lloyd's testimony at 1034 to 1040 of the record, materiality under universal health services requires a misrepresentation that induces something to happen. Amen. Exactly. And these bills were submitted by the laboratory to Medicare for years, disclosing the frequency of the tests as to the beneficiaries of the Medicaid and Medicare programs. And Medicare knew exactly what the frequency was by virtue of the frequency being disclosed in the bills. As a matter of fact... Most of that is irrelevant to my question. 98% of it is that. In fact, it did what it was intended to do, and that is induce payment. I'm sorry, Your Honor. I believe that the United States Supreme Court disagrees because I believe in the materiality discussion... That's a fact. I believe in the materiality discussion in universal health services... I thought we made clear that only applies to False Claims Act only. And it made it clear in that case. And it also said it was not going to look at it from the perspective that it was derived from common law fraud. Totally different. And I believe that the concepts that are developed that are maturing under the False Claims Act will be borrowed by the criminal law to apply to fraud in criminal arena. And to answer... That's a civil type action, right? I'm sorry, Your Honor. False Claims Act, civil. It's fraud, but it is civil. And the difference is a burden of proof. It did, sir. And the difference is in the burden of proof, not in the concept. And to answer... If you have an answer, I don't think you've really answered the question, but if you actually have an answer, fine. Otherwise, maybe you, colleague, because your time has expired. All right. You have an actual answer. And the answer is that when the representation is disclosed, then the representation cannot be material to the payment. I don't see how it couldn't be disclosed because if you keep your representation to yourself, it's not a representation. I mean, that makes no sense. Representations in the bills were disclosed to Medicare and Medicaid to induce payment, but the fact of the... Thank you. All right. Thank you very much. I actually, I think I understand your, please come on up, your colleague's position. And what he's saying, I guess, is since we told them about all of these procedures, and they knew we were seeking payment for all these procedures, that immunizes them from any claim that there's fraud, right? Isn't that the gist of what he was just saying to me now? I think that relates to the materiality argument. Well, that's all we were talking about, right? Yes. Well, then I guess I would go from there. So, even if that's so, even if you, let's take it away from this example, and I keep coming to you and saying I work for you and I want my expenses paid, and I keep telling you all my expenses, and I keep saying them again and again, but I don't relate to, those are my genuine expenses, but I don't relate to you that I go to dinner at four different places each time, and that's why my dinner bill is $500. And I'm only entitled to get one dinner reimbursed, not four different dinners. Don't you think that you'd still have a claim ultimately for fraud? Yes, Your Honor. And that's why I don't think that it seems to us that necessarily, just because they put down all of the procedures that were done, that they eliminated the materiality or the fraud. Your Honor, why the evidence was not sufficient to find Palin and Webb guilty of healthcare fraud is because Judge Jones found that the defendants had to have known that the testing was medically unnecessary. And there is no evidence whatsoever at trial to show that Palin and Webb had any medical training that they were ever told by the doctors or any other medical professional that weekly testing of the more extensive analytical testing in addition to the Quick Cup was not necessary. Maybe I can go back, because I'm not entirely sure I followed the thread of that. It's my understanding that the government doesn't really, or as I recall, doesn't really contest materiality or the need for materiality. Am I wrong? That's my understanding of the government's argument, Your Honor. Well, you should know. I would agree, Your Honor, that the government does not contest materiality. And so I think the question goes back to why is, and I'm not sure that materiality factored into the argument of, I don't see the connection between the disclosure and materiality that I understood counsel to be making. So perhaps you could explain that to me. I don't see why it matters. I think you just had planned just to address sufficiency of the evidence. Is that right? That is correct. Well, I'm sorry. That's correct. So if you have an answer to that, that would be great. Your Honor, I would prefer to address the sufficiency of the evidence because I think It's a very hard road. But it is not insurmountable, Your Honor. It is a heavy burden. And I would ask this court Are you saying there's no answer to Judge Duncan's question? Your Honor, I submit that I am not prepared to further address it. Mr. Corey will return and rebuttal. So That's entirely fair. Thank you. And maybe if we've given, maybe if we'd let you introduce yourself and say what you're going to talk about, this would all have been cleared up, I thought. I apologize, Your Honor. My name is Nancy Dickinson. I represented Mr. Webb at trial. I would like to address the lack of the sufficiency of evidence at trial. That's a tough one. Your Honor, I feel I am prepared to address the court's questions and concerns about that issue. The evidence showed that urine testing is necessary in medically assisted clinics. Patients who are seeking treatment for opioid addiction are prescribed a Suboxone medication. Weekly testing, all experts agree, is necessary, medically necessary. If you've got insurance, you get the bigger one. And if you don't have insurance, you get the other one. Is that the end of that? The Quick Cup. The Quick Cup was used for all patients. Well, it's used, in other words, if you've got insurance, you get the more, it's medically necessary for those who are insured to get the more expensive tests. But if you don't have insurance, are you saying it's not medically necessary for them to have the more expensive tests? Your Honor, it is medically necessary to have frequent testing and weekly testing. The Quick Cup is 90%. I just want to know, at least from that perspective, I mean, I'm not saying it's positive, but isn't that what you're saying, essentially, that if you have insurance, it is medically necessary for you to go through an analysis and a compliance test. But if you don't have insurance, you only need a cup. The cup provides a certain amount. Is there, the answer has to be yes or no. I mean, either, is there any other basis for determining who got the more extensive analysis and who got the Quick Cup? Let's not focus on the Quick Cup being necessary. Let's focus on the distinction between the more limited analysis and the more extensive analysis. Your Honor, there's no question that patients who had insurance received more extensive and more expensive testing, which was paid by insurance. Any basis in the record whatsoever for the distinction between the Quick Cup and the more extensive analysis other than the insured status? Yes, Your Honor, there is. The government's expert, Dr. Hughes Melton, testified that in his practice, he used the additional testing about 40% of the time. And the important reason for that, Your Honor, is that the Quick Cup is only 90% accurate. The Quick Cup does not test for alcohol. That really doesn't answer my question. My question was, is there any basis in the record to demonstrate that the people who got the more extensive analysis were not insured? No, Your Honor. And that was my question. I'm sorry. And I think it was also, well, it was my question. You didn't need that. Your Honor. So the only basis for that distinction was the insured status of the patient. Yes, Your Honor. The owners of the laboratory made a business decision that they were not going to provide testing for uninsured patients. They made that decision. They made that decision that they would not perform the testing. The doctor may have ordered it, but the laboratory is under no obligation to perform services for which it will not be paid. They chose the type of test depending on your insurance. So if you had one test, let's say the cup theoretically was a 25%. Great. And the other one was 98%. They could make that decision? Yes, Your Honor. The laboratory is under no requirement, legal or medical, to perform pro bono, to use a legal term, testing on patients. And the results were reported back to the doctor. Did they show up differently?  Well, this one only got the cup and the cup says 25%. This one got the more extensive testing. Yes, Your Honor. Did it show that difference when the doctor got it back? Yes, Your Honor. The doctor would have a report showing which tests were performed on each patient. It's important to note, Your Honor, that Dr. Wagner, who was not charged because he passed away prior to indictment, ordered extensive testing for all patients. Dr. Curtis, who worked in another practice separate from Dr. Wagner's, had the same practice of ordering these tests. Each patient... You said it was the lab people who made the decision. The doctor did not make the decision. When it got to the lab, it was your clients who decided, insured you get tests, uninsured you get the cup. Your Honor, I must clarify, at the laboratory, at the lab, Ms. Palin, as the owner, made the decision whether or not more extensive testing would be completed. I thought that's what I just said. I apologize, Your Honor. No, Your Honor. The doctor ordered the testing. You're saying that even if the doctor ordered more expensive testing, the lab could decide not to do it? Yes, Your Honor. Exactly. I mean, I think we'll... That's where I was getting at. The doctor orders a test, but when it gets to the lab, the lab makes the decision of what to test. Exactly, Your Honor. And it made that decision because it knew it would get paid a lot more money for the insured one than an uninsured one. That is correct, Your Honor. The lab made the decision about which testing it would complete, not which tests would be ordered. The doctor made the decision about which tests were ordered. That's the distinction. I think you're contesting whether this should be a crime. Exactly, Your Honor. I do not believe it's a crime at all. We had asked this court to find that there is no crime because the owner of the laboratory is not a medical professional. The owner received the medical order from the physician for the testing. The owner... The trial counsel, correct? Yes, Your Honor. So you made this argument to the district judge, right? I did, Your Honor. And what did the district judge say? Your Honor, Judge Jones found that the owners of the laboratory made that decision with the knowledge that the tests were not medically necessary. And that is where I differ strongly with Judge Jones' ruling because he imparted knowledge on the part of the laboratory owners as to what was medically necessary. But see, the problem is they only found it medically necessary to do the strong, the more thorough test when there was insurance. So that makes you think that it isn't a question that rested on medical necessity, but on ability to pay. And Your Honor, that is a sad status of healthcare in the United States. Can you really, with a straight face, say that only the people that had better insurance, that the stronger test was medically necessary only for them? Your Honor, I think it was medically necessary for all patients, but the doctor and the patient who has decision-making on what tests they will receive. When I go to the doctor, if the doctor tells me, ma'am, your condition requires additional testing, and I say, but I don't have insurance to cover it, but perhaps I can raise the funds myself and get that testing. I understand you're saying the doctor says it's medically necessary to have extensive tests. It then comes to the lab. The lab doesn't make a medical necessity. It says, I get paid more for insurance, so I'm going to test that. I get less for this, so I'm going to test that. That's all you're saying, is that right? That's a difference between...  I say that's all right, Your Honor. The problem that I have with that is nothing, in terms of medical necessity, there was no determination made based on the results. Everybody got the quick cut. Yes, Your Honor. But regardless of what that showed, additional testing was determined to be medically necessary if people could pay for it, but not medically necessary if they could. No, no, you can't say it a different way. You have to agree with me or not agree with me. Your Honor, I want... And I don't think you can disagree with me, because that was the basis of the district court's conclusion, was it not? At least in part. Yes, Your Honor, that was the basis of the judge's decision, but the point I want to make is that the owners of the laboratory do not make a medical necessity decision. That's a medical necessity. Except that they did. No, Your Honor. Yes, they did. They did with respect to those they decided not to pursue. They decided those were not medically necessary. I just... Maybe we're just not going to agree on that point. I feel it's important for me to explain, Your Honor, that... No, I think I understand. I really... I think I understand. The doctor ordered quick cut tests for all patients, insured patients received additional testing. The doctor did not order the additional testing for uninsured patients. I want to make that very clear, Your Honor. And he also... You test quite a few times, and your clients apparently called up the doctors and said, let's test them twice a week. Yes, Your Honor, that request... Medically necessary, or you think you just pass that on to the doctor, and once the doctor rubber stamped it, it became medically necessary? Your Honor, the owner of the laboratory did make that request, and importantly, the doctor denied that request and did not accede to the lab owner's request for more frequent testing, showing that the doctor had the decision... No, Your Honor. The doctor did not order twice a week testing as requested by the laboratory owner. I don't know exactly how that helps your client, but anyway, thank you very much for your argument.  Thank you, Your Honor. I appreciate the opportunity. Good morning. I'm Janine Myatt. I work for the Virginia Attorney General's Office, and I'm also a Special Assistant United States Attorney for the Western District of Virginia, and I represented the United States at trial in this case. I want to ask the first question, and I want to focus on what was just said. If the doctors say it's medically necessary for a test to be done and orders, I think she said cup test, gets to the lab, the lab doesn't make a medical necessity, it just chooses the test that it wants to do it, and does it on the basis that they admit, on if you've got insurance, I'm going to give you the bigger test. If you don't, I'm going to just let you do the little $25 cup test. Is that a... From their perspective, that's not a crime. From our perspective... Is that the fact... Are those the facts? They are not, Your Honor. The facts were that there was a doctor who was in private... Before you go there, if those were the facts, would that be a crime? I think that it would be. The crime, the essence of the crime in this case is the lab owners knowingly submitted for payment to Medicare and Medicaid and the insurance companies claims for medically unnecessary tests. And no matter what stage of the game that decision is made or by whom, if they know it's medically unnecessary, they're not permitted to submit it. And if they do, it's fraud. Can you tell us how that spins out with Judge Winn told you the facts in the beginning as we understand them, and how that spins out in this case? In this case, the lab owners actually told the doctors what to order before they ordered it. It wasn't a case of the order getting to the lab and them changing it. It was, they said, this is what we need to do. And in one case with Dr. Curtis and Dr. Miller at the Mountain Empire Medical Care Clinic, they owned the clinic. The lab owners owned the clinic and told them what kind of lab tests to order. I don't think I understand how this works, and maybe my colleagues do, but help me a little bit here. So how does the patient get, the patient just walks, a person just walks into the clinic and then the clinic tells the doctor? The patient, I don't, that can't be right. The clinic is owned, I'm sorry, I don't understand. Well, you told me that the clinic told the doctor what was needed. The lab. The lab told the doctor what was needed. Well, the patient is at the lab before he's at the doctor? Well, in one instance, the lab and the- I'm talking about there's a big mass of instances. What I want to know is what was the general way this went, this all worked? Well, there were two different ways, really. There was one doctor, Dr. Wagner, who was in private practice by himself, and his office was right next door to the lab. And it's the government's contention, and I believe the facts played out, that the lab owners and the doctor conspired to- I understand the contention. Where does the patient walks in? The patient walks in to Dr. Wagner's office. Okay, so he comes to the doctor first. Yes, and fills out some paperwork and then walks over to the lab. Has the urine drug screen taken, which was not observed, it was just, you know, they went in the bathroom by themselves and gave the sample. Most urine drawings are not observed. Well, I think the evidence was that oftentimes in this situation where you have opiate addicts who are likely to switch and do things like that. Part of the whole reason that the defendants, the appellants- Could we just sort of- Judge Motz's question factually, or at least let me own this. It's my question factually. The patient walks in to the clinic. Yes. Okay, and gets a piece of paper. These are mandatory drug screens, for instance, that they have to take for whatever reason. In this particular clinic, it was required that you pay $100 cash- No, no, we're not- And do a drug screening. Another sense. Why are you having the test? Why are they having the test in the first place? Just for job screening? No, no, because they are taking Suboxone. Suboxone, okay. So they walk in and the doctor gives them an order to take to the lab. Correct. When, in your telling of this initially, did the lab communicate with the doctor about this patient who's just walked in? You said that the lab had told the doctor what to do. Is there some- The lab, there was- The lab assisted the doctor or told the doctor what kind of tests to order for the patients ahead of time. Because all of the patients, it was a standing order, basically. Oh, okay. I see. So they did the same thing with all the patients. If they were insured, they got the automated screening. One was at Bristol Labs and then the other one was referred out to the forensic labs. If they were uninsured, they just got a quick cup. Now, at the Mountain Empire, that was Dr. Wagner's office, at the Mountain Empire Clinic that the appellants owned, the doctor there actually did a quick cup, an analyzer, and a confirmation on insured patients. So they got three and then the uninsured patients just got one test, the quick cup. Let me ask you a question. If a doctor has a certain number of patients, let's say 10 patients, and the doctor makes the determination that, well, five of them are insured and five are not insured, and I'm going to choose to order the cup test for the uninsured because that's only $25. But for the insured, I'm going to order the more extensive test. Is that a crime? And if that's his only basis, if every client, everyone that comes in, they're all the same. They're all the same. They're taking the same drug situation. But every time they go up, he always says, are you insured or not insured? Or if you're insured, I'm going to order this test. If you're not insured, I'm going to do that. Is that a crime? Yes, Your Honor, we believe that it is because there's no determination about whether the tests are medically necessary or not. And they shouldn't be paid for if they're not medically necessary. So let me ask this question then. If the doctor simply sends all of the patients over and just says, do a, he just said generically, do a test. And it gets to the lab and the lab says, well, do you have insurance? And it says, yes. Then you can pay for the bigger one. So I'm going to give you the bigger one. Do you have insurance? No. Well, here's $25. You can do that. Is that a crime? It all depends on whether the test is medically necessary. But is that a crime, right? No, they're not dealing with medical necessity. The only thing they got is that a test is necessary. The test is necessary. I think it would depend on the point of treatment for the patient. Can the patient make the decision? At the time that the doctor says you only need a test, can the patient says, I don't have insurance. So therefore, give me the cup. Assuming that all... That's not a crime. Assuming that the, well, I think that the lab would have to call the doctor and say... No, no, no. It just says, give the test. It's just a test. You can give the cup to everybody and satisfy. It says, give me the test. That's okay, right? Because the patient says, give me the $25 test, which satisfies the doctor's order. The insured person says, well, the doctor says, give me a cup. But I've got insurance. So I want the higher test. Can you do that? I imagine they can. Yes, Your Honor. I think so. I'm not sure that I understand. There's a lot of other extraneous things, like what does the patient's policy say? If we don't have the other extraneous things here, the calls back and forth, are those facts alone? That's kind of where we've been. So it's really, from your perspective, it's the fact that they actually call the doctor, but they're even getting this word called influence. Can a lab or physical therapist or any other type of collateral type service provider simply call a doctor and say, you know, you're not sending me enough patients over here for physical therapy, and you need to send me some more. And send me insured ones or whatever. Is that a crime? I think it could be an indication of a crime with other things. That in and of itself, I'm not sure, Your Honor. You've got a single patient. If you look at this one patient in isolation, you can't say it's a crime, right? No, no. So it makes it a crime when it's multiple patients. When there is a preexisting pattern. It's a scheme to defraud, Your Honor, and the tests aren't medically necessary. It's not a defrauding in one instance. It only becomes a defrauding when you do many. It's what you're saying. You've got to make it a scheme. It's not a defrauding in and of itself. Unless you had, with respect to this one patient, the understanding that you would automatically only get the cheaper test. If it were the standing, it's the existing of the standing order that governs, that allows for the inference. I think, Your Honor, the situation that you described is an individual patient dealing with their own individual circumstances, their own, what's medically necessary in their case. And in the case that we have with these appellants in Bristol Labs is, they didn't look at one case. They looked at everybody and treated everyone who's insured the same. See, that's the difference in the facts. And I understand the points being made by the judges here. But from the perspective, what I'm hearing from the defendants is, the medical necessity was made by the doctor. When it got to the lab, they made a decision. We're just going to get insured the higher test and this one, the other one test. But you are connected by saying, they call the doctor and says, you ought to do this because of this. But the doctor only sent a generic test they know. And they can't, and even if they call the doctor, the doctor ultimately has the responsibility for determining medical necessity. And he does it. So if he sends over, if he had sent over, after he says call, only send the, do a medical necessity on just the insurer. And in one zone, uninsured, do CUC. Did he do that? No, the lab owners went to each doctor and told them ahead of time, this is what the standing order will be. With insured, you'll have the automated testing. With uninsured, you'll have the quick CUC. What did the doctor send them? The doctor, the order, which the lab employees who were either, who were stationed in the doctor's office. They were called collectors. I'm sort of, I'm sort of jumping ahead. I said, what did the doctor send to the lab? Did they send an order that says for my insured, do only the other, the higher tests and for the uninsured, do the CUC? Yes. They sent an order that said that. Well, wasn't the order... I really want to hear the answer to the question. They sent an order that said that. I don't want to say exactly the word that were in the order, but yes. But it wasn't a generic order that simply says do testing. No.  No, it wasn't. All right. And I think in the joint appendix, I think it's... The standing order, the standing order differentiated the test that was available for the categories of patients. I would encourage the court to look at, I think it's at JA 421. There's a number of exhibits. There's some go-bys that the lab employees used to teach the other lab employees how to fill out the forms. The doctors pre-signed these forms, blank forms, and the lab's employees would go and check off which tests based on whether the patient had insurance or not. And that's what would go with the urine back to the lab. And that's how they would know what kind of testing to do. So they were pre-printed forms, pre-signed by the doctors, blank. And the defendant's employees filled out the forms depending on whether they were insured or not. So they were the ones making the decisions, not the doctors. In fact, the doctors testified to that, but they didn't know that until after the fact. Of course, Dr. Wagner didn't. He wasn't there. But Dr. Curtis and Dr. Miller both said that they're not the ones that decided what kind of drug testing would be done. They agreed that there should be drug testing, but... And in fact, Dr. Miller said, I wasn't doing weekly drug screening. And then he got an email from Beth Palin and Joe Webb saying, we need you to do weekly drug screening. And he said, okay. But before that email, he wasn't doing weekly drug screening. And then after the search warrant and that practice closed, he took his patients to his other practice and stopped doing weekly drug screens. Okay, that's all very helpful in the fact.  Thank you, Your Honor. The evidence was that Beth Palin and Joe Webb through their company, Bristol Labs, knowingly and willfully billed or caused billing to the insurance companies. And the evidence at trial is that none of the health care benefit companies, none of the insurance companies, Virginia Medicaid, TenCare, Virginia Medicare, would have paid for those drug screens had they not been medically necessary. I think... Sorry, go ahead. I just think this all goes to the evidence question. And what I was wondering, hoping you could help us with the legal question, which I had thought was sort of where the rubber hit the road in this case. So maybe you can advance to that. In other words, the contention is that the district court indicated when he tried the case that there was no need to find materiality. You can dispute that or not as you see fit. And that he, in fact, did not find materiality. And you can dispute that as you see fit. But after the fact, he said that. And then he also said, in fact, these misrepresentations were material. And what effect does his post-trial musings have on what happened at trial? Your Honor, what the defendants did when they sent bills for medically Well, the question, which is my question as well. Maybe it's my question. I'll just own this. The question is, what did the district court do? Not what the evidence shows. What did the district court do? He said it wasn't necessary to find materiality. And my question to opposing counsel was, understanding that that's what he said, was it nevertheless implicit in what he did? Yes, Your Honor. And is that undercut, as counsel contends, by what he said post-trial? For my question, don't go back to the evidence. Tell me what the district court said and what the district court did with respect to materiality, and when did he say it and do it? The court said that after the fact, when it was brought up about the universal health care case by the defendants, I mean the appellants, that it's not explicitly an element, but that it's implied in the common law and is part of a scheme to defraud. And because it was implied, it's part of it, but he didn't come out and say it is an element. It is just what Judge Wynn was sort of gone full circle here. I don't want to copy Judge Wynn, but it does seem like a sub-element sounds like exactly what it is. Materiality is really important in fraud, common law fraud. So did it ever rule that materiality is not an element of common law? I don't know. I think the court said that it's not in the statute, but it's implied. It said it was not in the statute, right. I mean, it's not. That's factually accurate. But did the court rule that materiality, per se, is not an element of health care fraud? I didn't see that in the court's ruling. I saw that he thought it was implied, that there's no cases that say it's an element. This is all post-trial? Yes. OK. So let's just focus on trial for a minute. Is there anything in the trial that you regard as an implicit finding of materiality? Yes. And what is that? That none of the insurers would have paid for it, a test that was not medically necessary. OK. None of them. Even if there wasn't that, even if there was no implicit finding of materiality at the trial, post-trial, if the court had, let's leave aside his statements about what he did at trial, but post-trial he's found, in fact, I've read the post-trial motions and I agree that this has to be material and make a finding that's material. What's the effect of that? Well, Your Honor, in the If he hasn't found materiality, he's the trier of fact at judge trial. So he's the trier of fact at trial. He hasn't made a materiality finding at trial. We're hypothesizing. And after the fact, he makes the materiality finding. What's the effect? It's harmless error that he didn't find it at the trial level because he's the trier of fact. So he can go back and weigh the evidence and make a finding of materiality. I don't know if he came out and said that, but he certainly said this is material. How can it not be? I guess the government's position is he implicitly made a materiality at trial. Yes, Your Honor. Post-trial, he said, I didn't find it material or I didn't reach the materiality question or something that makes that equivocal. But then he made an explicit materiality finding. Correct, Your Honor. Even if the universal health care standard was to apply to this case. Well, let's leave universal health care aside. There was fraud before universal health care and there's going to be fraud after universal health care, right? Yes, Your Honor. I understand. And I'm about to run out of time. Do you want me to continue? You have a little extra time because we gave the other guy an extra 10 minutes. The universal health care, why I keep harping on that, and I think the judge did too, is that's how they raised the issue. I understand. But the court said that it was material. And I think that that's sufficient because in the Nieder case, it was kind of a similar situation. It was bank fraud and mail fraud, I think, and wire fraud. The court in that case said it was harmless error that the court didn't give a jury instruction about materiality. And one would think if it's harmless error if you have a jury and then post-trial a judge, it would be more harmless error if the judge is the fact finder both times. That's your argument, right? Yes, and there was never any argument at trial by the appellants that medical necessity wasn't material or wasn't important. Well, wasn't there an argument during trial that materiality and especially materiality in relationship to the Supreme Court case was an element? Not at trial, no. Not at trial. No, the Supreme Court case came out after trial. But of course, it had to have been pending. Correct, Your Honor, but it never came up until after the fact. I would point out that the medical necessity wasn't just based on frequency, as Mr. Corey had indicated. It was also based on the fact that the doctors weren't using the tests to direct the patient's treatment. Let me ask you this on that. When the defendants, in fact, decided to test insured one way, uninsured others, were they acting on the doctor's orders? No, Your Honor. So the doctor did not order insured to be tested in a certain way and uninsured to be tested another way? Oh, yes, Your Honor. I misunderstood your question. So were they acting on doctor's orders? They told the doctor what to order. And then the doctor... I got that point, but I want to know, because you can tell a doctor anything. You can tell a doctor, I want to go through MRI, the whole bit, and he can go out there. I can go off the street and do that. Well, I may be benefited. I may own a company to do it. But the doctor has a responsibility. My question is, were they acting on doctor's orders when they filled these tests in particular ways? I believe so. In other words, they were doing just what the doctor told them to do. But your problem is they told the doctor to tell them to do it. Right, and there was evidence that the doctors didn't know what they were signing. But the illegality... But you got these lab people in there who are filling out these forms and filling in the blanks, and they're all standing orders that are already signed. I'm trying to determine who has the medical necessity responsibility. And if from the first instance, if the doctor, whether he signs something blank, let someone fills it in for him, I want the doctor to be responsible for what's medically necessary. So my question is, when they filled those orders out, were they following the doctor's orders? Whether they asked for them or whether they just fell out of the blue, were they following the doctor's orders? They had a piece of paper that said, that had the doctor's signature on it. I don't get it. I don't get my... Then either they were following the orders or not following the orders. Or either the orders weren't legit. Are you saying the orders were not legitimate? Yes. Why weren't they? The doctor had signed them. Because they signed a blank piece of paper and the lab owners filled them out. Who says they weren't legit? Well, two of the doctors that testified said they didn't know what they were ordering. And that's... That's a good case for them on medical negligence. That's good. Was it a conspiracy case? I don't disagree, Your Honor. But Judge Jones didn't agree with us about Dr. Curtis at least. Yeah, you got Dr. Curtis out. So you got to get Dr. Wagner because he's no longer with us. But... Correct. It was charged as a conspiracy, right? So that the doctor was in the government's charges. Yes. I agree with Judge Wagner. Yes. Yeah. Seems the necessary element. Yes. Okay. Do we have further questions? No. Thank you very much. Thank you. We'll give you five minutes. But stick to those five minutes because you've already had a lot of time. Yes, Your Honor. Thank you. So, materiality and misrepresentation that induces payment is not material necessarily. So long as everything that was done is disclosed in the bill. And I just want to point to a statement that was made by the United States Supreme Court in Universal Health Services says, if the government pays a particular claim in full, despite its actual knowledge that certain requirements were violated. And the contention in this case is that what was violated is that the urine drug screens were too frequent. That is very strong. That was not what was at issue. The issue is how would the insurance company know whether the tests were medically necessary or used to direct treatment? Insurance company doesn't know, neither do we, the laboratory, because we're not doctors. That's a different argument. The only one... That's not the material... If you could stay with the materiality argument. You were saying that it can't... Fraud can't be material, even if it induces payment, as long as the underlying facts were known. And I don't think that's a correct statement of the law in this context, at any rate. Because this is a perfect example... I'm sorry, Your Honor. Did I interrupt you? I'm sorry. I only have five minutes. And the fact of the matter is... You wanted to hear, but if you're not, take your five minutes. It's not that I'm not interested. It's that I disagree. And the fact of the matter is that my client performed tests pursuant to doctor's instructions that were on a pre-printed form. All the testimony at trial was that the doctors decided what types of tests would be performed. And that's absolutely fine. The only thing I was caveating in your response is you have now slid away very astutely from materiality. And a misrepresentation in this context cannot be material because the bills reflected the name of the patient, the reason why... You're saying that it can't be material because the tests were performed. The tests were performed and everything about the tests were disclosed to the various payors. And the frequency was the most important part of it because the whole point of this case was that the tests being performed so frequently were medically unnecessary and excessive. And that was the fraud. And to answer Judge Wynn's inquiry, there is no question that my client refused to perform the less expensive tests on non-insured patients. No question about that. All the patients needed these tests and they needed the most expensive tests. And those were the ones... You had a conversation with the doctor. Why don't you just let the doctor keep sending the patients over and say nothing to them and just do what you said you're doing? And that's what... That's the doctor's point. That's not your case. That's not your case at all. You waited until you found out you weren't making money on these things, call up the doctor and have... Get into this thing with the doctor. The doctor then makes a decision to send one way or the other. You could have just... Your case is you did nothing but just changed the way you were doing lab. And we made a decision on our own. We're going to give this test to the insured. Uninsured gets this. And that's business. That's not fraud. That's not what you did. That... Well, that what we did was we followed the doctor's orders unless the insurer... Yes, after you called them up. And went back and forth with them on the whole thing there. Yeah, that's what you did. And then you own the other clinic and you got a doctor working in there and they don't even know it. You got standard orders that are sitting there already filled out. These doctors are signing these orders and you got people back there in the lab filling them in. And all of a sudden, are you saying at the end of the day, if we go in your way, this is the way it's going to be? That you're going to make $12 million off of claims like this by calling up doctors, trying to influence them to do tests, not one time, but two times a week. And realizing insurance company may pay me $1,200 for this test here, or I'll get $25 for the uninsured. So I'm just going to work this thing out because we're in the business of making money. And that's okay? I think that's absolutely okay. I want to be very clear about it. That my client had absolutely no obligation to perform tests that couldn't be paid for. That's business. That's not fraud. And those were the only facts. You might be okay. But that's not what your client did. Your client was very active with these doctors in terms of going back and forth. And the word conspiracy means anything. I mean, then you got a problem, at least with Dr. Wagner. The state of the law is when you find one not guilty on the other. Then about every business here in Richmond would be guilty of fraud and would be a member of a conspiracy. A business owner is expected. That's a problem when you're dealing with healthcare fraud, which is easy to do under these kinds of circumstances. And that's how you move up to $12 million. Right. And God bless them for doing it because they grew a business. They employed people. They figured out a way to go out and make money. The doctors ordered the tests. And they only billed the more expensive tests that could be paid for. That was the test that was ordered. And if people couldn't pay for it, people didn't get it. That's a legislative problem. It's not my client's problem. Insurance company problem. Well, and maybe an insurance company problem, too. But that's not fraud. We appreciate your argument. All right. We will come down and say hello to the lawyers and then go directly to our next case.
judges: Diana Gribbon Motz, Allyson K. Duncan, James A. Wynn Jr.